Before we start our regular proceedings this morning, I'm going to turn it over to Judge Clevenger. Yes. This morning, before we hear the oral arguments, we have an important matter of business to take care of. Important to the court and important as well to the individuals involved. I believe, if I'm not mistaken, we have an individual who would like to apply for membership in the Bar of the Court. And I believe Judge Prost would like to proceed now with a motion to that effect. Thank you. Please stand. Thank you. I move the admission of Daniel Severin Sternberg, who is a member of the Bar and is in good standing with the highest court of Massachusetts and New York. I know, I have knowledge of his credentials, and I'm satisfied that he possesses the necessary qualifications. As I've said before, these are bittersweet times for us on the bench because we've had the pleasure of dealing with terrific clerks like Dan for a year or a year and a half. And then it's so sad because they leave us. But we've had a great run, Dan. I've appreciated all your efforts. I know you'll have a lot of success in your professional and private life. And we wish you well. I move the admission. Thank you. Motion is granted. Thank you. Please stand. Please step to the clerk of the court for the admission of your oath. Do you solemnly swear or affirm that you will comport yourself as an attorney and counselor of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Congratulations. Congratulations. Thank you. Thank you, Colonel. First case this morning is 151322, Bose Corporation v. STI Technologies. Mr. Hebert, please, whenever you're ready. Good morning. May it please the court. The two Bose patents at issue here are directed to a sound reproduction device that connects to a computer where the sound reproduction device and the computer send signals back and forth to each other. And the claim construction issue concerns, as with the briefs, I'm going to direct my comments to the 6A2 patent primarily. So the claim construction issue relates to Claim 25, which says that the audio system of Claim 1, it's a dependent claim, wherein the sound reproduction system is configured to respond to signals received from the computer. So configured to respond is the disputed phrase. Bose proposed that configured to respond referred to configured to provide an answer or reply in response to the computer and not simply take an action as STI argued and the board found. The case is actually very much like pretty much all fours with the PPC broadband case that came out in February, which dealt with a very similar issue. Multiple competing dictionary definitions. The board is allowed to use the broadest reasonable interpretation. Indeed, absolutely. And there are two dictionary definitions. Why is their selection of one of those definitions unreasonable? Because the specification, just like in PPC broadband, where there were also two dictionary definitions that could have applied. And just like in PPC broadband, where the term that was disputed was used in the specification only in connection with one of those definitions. Here, too, the term in the specification, respond, is used only in connection with the definition that Bose proposed. Say something in return. Make an answer, which in shorthand is... That's a question of how a lot of ordinary skill in the art would read the specification, right? And there's a disagreement there. You contend that the specification is just absolutely clear that the proper interpretation for configuring the respond has to be to provide an answer, reply. The other side and the board says, no, no, no, we read that different. So the board is looking at the broadest possible dictionary definition that they can find, which is the same approach that was applied in PPC. And you're proposing a narrower definition than the one the board applied. We're proposing the definition that directly applies to the specification. But your definition is narrower. Pardon me? Your definition is narrower. It's the direct definition that is narrower than the board selected that applies directly to the use of the term in the specification, both in connection with the term as it's described in column one and column two, we quote that, and also the examples that are given. All this matters because if you're right, then ALTEC is off the table. That's correct. That's correct. There's no dispute on that. So as I say, it's just like PPC broadband. In PPC broadband, the issue had to do with what? Counselor, let's suppose that we find that both interpretations are reasonable. Under BRI, don't we have to go with the broadest interpretation? So PPC broadband deals with this, and it says that simply selecting the broadest definition does not necessarily result in the broadest reasonable definition in light of the specification. Here, my scenario is that they're both reasonable, and I think this is a close call. And it seems to me that both of these interpretations are reasonable, and yet we do have to honor or apply the broadest reasonable interpretation, correct? The broadest reasonable interpretation consistent with the specification like in PPC broadband, advanced fiber technologies, O2 micro, and SUCO service. But that's not all. I mean, the board didn't say, I'm going to take the broadest interpretation. Who cares what the specification said? The board analyzed the specification. It analyzed the paragraphs, the passages that you relied on. And it concludes that these, the portions that we're relying on don't require that RESPOND be construed narrowly. So why are they wrong? What they did is they looked at the one place. There's two usages of the term RESPOND, bridging columns 1 and 2. That's where the term, only place the term is used in the specification, and that's used the way we say it's used. And they ignored that because they said it was going in the wrong direction. It wasn't the right component responding to the other component as in the claim. But it is the only use of the term RESPOND that's in the specification. But beyond this. So the term is used, but it's being used in the wrong context. Isn't that the point? So the context has to do with one component sending a response to the other component. So if A responds to B, that's a usage and an illustration of the usage of the term RESPOND. And it doesn't matter. What you're saying, what the other side is saying is you're saying the specification is just clear as day. And the other side says it's clear as mud. And so there's an unlikely case that you've cited over and over and over again, where I don't recall any real disagreement as to what the specification was teaching. Here there seems to be some room for doubt as to whether your read of the specification is correct as opposed to your opponent's. So in a situation like that, I don't think you have quite such a firm grasp back to the precedent you cite in your favor. To the extent that the court may think there's room for doubt between those two constructions, it's answered by claim differentiation. When we look at Claim 1 and what Claim 1 requires- There was an explanation on that side as well. It was not a clear slam-dunk argument in your favor. Well, actually, I think what SDI does in its brief is they engage in a little bit of misdirection because they don't really have an answer to the claim differentiation requirement. Claim 1, as it is instructed, is configured, includes components, which are configured to respond under their construction, namely take an action in response to the signals. It includes signal processing circuitry. It includes a speaker. These are the very actions that they point to in Alltech Lansing as saying, well, Alltech Lansing meets the claim because it takes an action, but Claim 1 has the structure that does the very same thing. And so Claim 25 has to be narrower than Claim 1. Well, the board goes through and analyzes the arguments and concludes that claim differentiation does not provide a slam-dunk for you. And then it points out, which is unassailable, right, that claim differentiation, quote, is not a rigid rule, but rather is one of several claim construction tools. So we've had numerous cases in which we've rejected that claim differentiation will trump, therefore, the conclusions we've made. In those cases, there's a reason for doing that. So the claim differentiation establishes a presumption. It's not a hard and fast rule, I agree, but it establishes a presumption that the dependent claim has to be different in scope and narrower than the independent claim. And the cases that reject that typically have something in the file history where it's rebutting the presumption or some other reason for doing it. And none of that is here. There's no evidence of that here. Really, there aren't cases where we just say, well, our analysis of the other factors, including how we read the spec and so forth, is sufficient to trump the document of claim. I think those cases generally, I can't say for everyone, but I think those cases generally point to some other evidence like the file history or that there are other elements in the dependent claim in addition to the one. So it's not a clear case. So help me out a little bit. We're talking about whether we're talking about an issue of learning something from the spec in terms of that for claim construction as well now, claim differentiation. What standard of review are we applying to those sub-issues? De novo. This is claim construction. And that's true with the claim differentiation as well? I believe so, yes. As part of claim differentiation. Yeah. If you have time, I'd like to move to the evidentiary issues. The major problem here with the evidentiary issues is that the board disregarded its role as a board which reviews the arguments of the parties and instead stepped in and acted as an advocate for SDI. And the recent case of In Re Magnum Tools talks about this, talks about the limited role. Are we talking about Irman now? Pardon me? Are we talking about the Irman reference now? I'm talking about the evidentiary. Yeah, Irman. You're talking about the evidentiary issue. This is the hearsay and authentication. Right. And so In Re Magnum Tools, 829 F3rd 1364. It's a relatively recent case. And what is it that Irman teaches that you're trying to get away from? Why do you want Irman out? So Irman is one of the – so it's a three-element combination without Irman. There's a remote in ALTEC, right? There's a remote in ALTEC, right? So you don't need Irman for that. There's no remote in Irman, right? So what do you need Irman for? What's Irman doing in the 103 mix? So there's two arguments here. One is the evidentiary argument that it never should have come in on the evidence that was presented because of its hearsay. If it's not necessary, then it's harmless error. So what is it about Irman that you need to get rid of? Why do you need to get rid of it? The 103 analysis. Because it's not admissible art as part of the combination. You need it in the combination. They need it for the combination. Because why? They have no combination. They have no argument to make the combination without these – What I'm trying to get at is what is Irman contributing in the combination? I mean, ALTEC seems to me that it's got almost everything in the invention right there in ALTEC. Right? You've got a computer. You've got a speaker. You've got a computer. You've got speakers. You've got communication between the two, and you've got a clicker doing the job. Okay, so what Irman adds is an IR receiver that talks to the computer and sends control signals from the IR receiver to the computer to control functions on the computer. And what they want to do with their combination is move the IR receiver to the ALTEC Lansing speaker and have the ALTEC Lansing speaker send control signals to the computer. And that's not in the ALTEC Lansing reference. So what they do is – That's the infrared, the IR. Okay, I got the picture. Pardon me? It's the infrared. Yeah, and control – and the part of the infrared receiver in controlling the computer. That's what they're looking for. But in terms of the evidentiary issues, we had a hearsay argument. Bose actually – I'm sorry, SDI – disclaimed that they were relying on the truth of the matter asserted. So the sequence, we have objections to evidence. There's a deadline for that. We made objections to Irman on hearsay and authentication grounds. We filed a motion to exclude. And what they said in both IPRs – we have two – we have four related proceedings here. But in both sets of IPRs, they said the exact same thing. They said because Exhibit 1010, which is Irman, is offered for what it says, not the truth of what it says, it is not hearsay. And they disclaimed relying on the truth of Irman because they didn't think they needed the date. And they later realized – and you can see this from their brief – when it comes time to file their brief in this court, they realize that they have a hearsay problem and they come up with brand-new arguments never raised before, not in the record, about the residual exception and about automatic machine-generated time stamps. Let's talk a little bit about the specific reference that you're talking about here. What is it? You say it's not offered to prove the truth of what's in it, right? But it is. You have to have the date. Otherwise, it's not prior art. What about the exceptions to Rule 807? The residual exception of 807 was never raised by SDI once at all in the proceeding. The residual exception – I mentioned that the board's acting as an advocate for SDI. They raised this and they briefed it themselves in two and a half pages of their final written decision. What's wrong with the board saying themselves there may be a problem here with this particular piece of evidence? I mean, this is not a U.S. district court. This is an administrative agency. And the board says there may be a problem in this particular piece of information and there's an escape hatch here. The law recognizes a way in which if we satisfy ourselves, we can do it. It wasn't as if you were – or even if you were Shanghai, you never got a chance to participate in this. So one of the requirements of 807, in 807B, is reasonable advance notice of what they're going to argue, who's going to argue it, how they're going to apply it. That was never given. Did you petition for re-hearing on this ground? No. Why not? There's no requirement. So Enri Magnin addressed it. Your argument at the board did you a classic no-no, blocked you out, didn't give you an opportunity to participate, hopped up in the middle of the night with a strange ruling for the exception that's hardly ever applied and stuck it down your throat, and you just swallowed it and digested it. No, we appealed it to this court and there's two reasons. Why didn't you appeal it to this court? There was a mistake. They made the mistake. Why didn't you petition for re-hearing to them? There's two reasons. If you look at the rule on re-hearing, it doesn't fall within it. The rule for re-hearing requires that you point to where you previously raised the alleged error in the prior record and why it was overlooked. That's the re-hearing rule in the PTAP. You're saying to me that there's no recourse at the PTO in a situation where the board fang-eyes you, brings up something brand new, never gave you a chance to comment on it, so there's no tracks in the snow, right? So you're barred from filing a petition for re-hearing? So the re-hearing rule limits the issues. You'd be making a constitutional argument, wouldn't you? A due process argument? Somebody did that to you? It's, in effect, a due process issue. And that's what we've argued. But also, In re Magnum says that there's no obligation to preserve your appeal issues to file a petition for re-hearing in the first place. The error here doesn't fit within it. It seems to me that when you're dealing with an abusive issue or it's on appeal, abusive discretion, which is what this issue is, that discretion would certainly suggest that a prudent counsel would go to the party who zapped them and said, hey, you shouldn't have done this to me. You never gave me a chance even to inform you, right? So what we did actually exercise your discretion, right? So what we did is we actually tried to do that after the first set of IPRs. So in its final written decision in the first set of IPRs, the board got new evidence. They went to the Internet Archive. They got a blank Internet Archive standard affidavit. And they marked it as a new exhibit. I think it's exhibit 3004. Never introduced by any party, never raised by them. And we filed objections to that. We filed objections. And we filed, I think, a motion to exclude that. And those are in the appendix. But they were actually expunged by the board from the proceeding. Do you think you filed a motion, or you didn't? We filed objections. You think you did something, and then you did not go look. You didn't do it. I know that we filed them. You just said they expunged? They expunged what and why? So we filed objections to the new piece of evidence that the board came up with on its own. And we got an order expunging our objections. So that's all in the appendix. Expunging your objections or denying your objections? No, expunged. Expunged, not denying. Not a ruling on it. Expunging as not being within the rules to file. Is exhibit 3004 in the record? Yeah, it is. Like where, please? And the so-called order expunging the objection, cite for that, please? So exhibit 3004 is A2268. 2268? Yeah. Our objection to that is 1425. And I don't know if we have the docket entry for the order expunging it. Oh, it is. Yeah. A37. A37 is the order. It's called order conduct of the proceeding. A37? A37 through 39. I see I'm well over. We'll restore two minutes of rebuttal. Thank you. Mr. Lowery. Thank you, Your Honor. May it please the court. Matt Lowery of Foley and Lardner for the appellee SDI. I thought I'd just start really quick with an update on the related cases because a little bit changed since the briefs were filed. The parent to the patents in suit here was the subject of litigation. A court granted summary judgment of no infringement in an appeal heard by Judge Clevenger. Non-infringement was affirmed for 143 of 144 products. That case stayed pending an inter-parties re-examination. In the re-examination, all of the claims were found invalid. Bowes appealed to this court, and that was the state of that at the time of the hearing. Since that time, Bowes withdrew its appeal in the hopes, I think, of filing a reissue and merging some procedural stuff. But the long and the short is, the certificate is issued, all the claims have been found invalid for the parent application. And then the underlying case dismissed with prejudice. Why don't you move on to, why don't you start where your friend left off, which is what the procedural posture is and what went down with respect to this exception. Okay, so in terms of, with the evidentiary issue, Your Honor? Mm-hmm. Yeah, so what actually happened here is, Bowes did not actually request reconsideration or rehearing. They filed a notice of objections, which was procedurally out of order. And so the board issued a decision saying, you can't just file something like that. You need to request leave, and you did not. And that was what the board did. But there was no request for a rehearing, no request to reopen. Yeah, but what happened here? I mean, the board on its own came up with this evidence on its own? So the issue, if I may step back, Your Honor, is, first of all, authentication. Is this what it purports to be, a record of the Wayback Machine? And there's no question that it is, in fact, a record of the Wayback Machine because the board separately went and confirmed it. It also found distinctive evidence and whatnot. So it found authentication. Then the next question is? Can you stop? Can we stop there? Yes. So there was a dispute over its authenticity, and the board went out and did its own search in order to establish that? I guess I'm... There wasn't actually really a dispute over authenticity. There's never been a suggestion that there's any reason to believe that it's not authentic. There was an objection saying... I want to talk specifically about the piece of information. You have a piece of information, Hireman, in that reference, right? Yes, Your Honor. And there's a date stamp on it somewhere? Correct. A stamp placed there. What is that piece of information? What is it? What does it teach? It shows... So the way the Wayback Machines is, they take records, and they don't know when they were created, but they know when they received them. And so they put a stamp... And who are they in that sense? Is that a company? Is that a service? It's a company providing a service. Yeah, it's the Wayback Machine. And they're sucking stuff up from the Internet? Is that vacuuming things from the Internet? Is that what they're doing? Correct. And placing time stamps on them. Okay. And they then say... And you can go and... And this particular reference is one example of that sort of thing, a piece of information vacuumed up from the Internet? Exactly, Your Honor. And somebody put some date on it? Well, actually, the machine did. The Wayback Machine puts the date on it. And was that date supposedly referencing the date in which that piece of information came into existence or when it was vacuumed? When it was vacuumed. So we know that the IR-Man itself has a 1998 date on it. The Wayback Machine has a 1999 date on it, which establishes that it was pulled off of the Internet and put into the Wayback Machine on that date. On 1999. I believe that's correct. Yes. So what did the board do in terms of finding the authenticity or the evidentiary value of this that wasn't done by the parties? The board looked at, took judicial notice, which they're entitled to do, of the Wayback Machine record itself. Well, who came forward with the Wayback Machine record? It was filed with the petition. Oh, okay. All right. It's a piece of prior art that goes into the 103 mix. Correct, Your Honor. And we filed it with a petition. And the same could be said, by the way, for a journal article. The journal article has a date on it, and you say, well, that date is hearsay. Right? And so how do you prove that that was the date? And these things very rarely come up, but I guess they do come up. They certainly have come up for the Wayback Machine. It's sort of like a date stamp on a fax machine is the idea? It is, Your Honor, which makes it not hearsay because it's done automatically. And that is all established in the record by materials that Bo submitted off of the Wayback Machine without their own authentication, of course. And it's established by the affidavit that the board found you just go. And it says, this is how the Wayback Machine works. We receive all of this information, and we automatically put this date stamp on it. And that establishes the date that it came into our records. And there's an affidavit that you can get, and the board looked at it, and the board said there's no point in making them go get that affidavit. It would, you know, you have them sign it. Whether or not this particular date stamp actually can be treated as showing the date at which the thing was pulled off, 1999, and if that's true, then it's prior art, correct? That is correct. Okay. So is, and the board is listening to the arguments back and forth. Is that a fact question that the board is deciding? Vis-a-vis authenticity? That's an interesting question. As between legal and factual, it's certainly factual. It's reviewed for abuse of discretion. So it's an act of discretion to admit or to not admit. I know that, but I mean, an act of discretion can prove to be an erroneous act if a legal mistake was made in the process of exercising the discretion. Yes, sir. So what I'm trying to get at is when the board is here trying to decide whether or not this particular reference has a 1999 date on it, should we treat that 1999 date as accurate? That's absolutely factual, Your Honor. And that actually is the opposite. Do you have a case for that proposition? Well, I believe. Has this come up in the context of, for example, a fax machine date? Because I know fax machines have automatic dates put on them. There are decisions to say fax machine dates are actually not hearsay at all because they're done by machines. It's not the spoken word of the human. And the Internet Archive information, and other courts have taken judicial notice of aspects of the Internet Archive. There are decisions that describe how the Internet Archive works. This isn't brand new here. And, in fact, in the materials from the Internet Archive— Take the issue in two pieces. Let's assume for purposes of authentication, we agreed with you that the board was correct in deciding that they can treat the 1999 date as an accurate date. Then does hearsay matter at all? I think authentication—the hearsay objection gets subsumed in. It actually merges, and I think there's a case that says— Well, why is that so? Why is that so? Because if it's authentic, that establishes that it was there as of that date. What I was trying to get at is whether or not the date was hearsay or whether what the reference is trying to teach in the combination was hearsay. Yeah, so what the reference teaches, and there is— that is, of course, a factual question. And that's the oddity of this procedurally because you can object to the admission of evidence or you can say the evidence can come in, and now the question is, has it adequately proved to be prior art? That would be a substantial evidence fact-finding question, the second one. The first one as to whether you admit it. And most judges, especially in a bench trial, they'll say, let's bring it in and I'll figure out what it means. And that's the practice of it here. All they need is reason to think that it's that date, and then it can come into evidence, and then the next part of the inquiry, which Bose actually didn't argue, is— I'm confused by this hearsay problem. It strikes me that in these patent office proceedings, generally most prior art references are hearsay because you can't challenge the person who said it. You can't cross-examine the person that created the reference. Correct, but it's not the— in that context, it's not offered for the truth of the matter asserted. So, for example, if the reference says the sky is blue, you're not offering it to prove that the sky is blue. You're offering it to show that the prior art was aware that the sky was— We're not trying to offer this for the truth of the matter in it, right? Right. We're offering it as prior art so it doesn't matter if there was an IR man product, for example. That is a piece of prior art, whether the IR man product ever existed or not. So it's not actually what it says is true. It's that people in the prior art would be aware of it. It's on the workbench. Before time runs out, can we go back to the first point your friend started at, which is the reliance on the specification as reasonable support for the board's selection of the broader of two interpretations? Yes, Your Honor. So the question is what does configured to respond mean? And I think the example in the brief is if you ask someone to go to the grocery store, they can respond by going to the grocery store. That's an action. Or they can respond by saying, I heard what you said. That would be the narrower version that Boaz is arguing for. So we're saying it's reasonable, actually I think even in a court proceeding, but either way, the broader version of responding with an action is within the scope of the claim. And the specification actually supports it in a couple of ways. First of all, Claim 1, as the board cited in its opinion, Claim 1 says a different component, control circuitry in the speaker, can in response to something either take this action or send this communication. I think, for example, turn up the volume or send a signal to the computer. So it uses the phrase in response to, in the claims, in the unequivocally broader sense of the word response. But also in the narrower sense. Both, right, the broader interpretation. And we're not saying it doesn't include sending a response, doesn't include sending a signal back. It does. It's either sending a signal back or taking some other action. It could be both. And so the question then also is... Is there ever a situation where no action is taken? It seems to me that if you send a signal and nothing happens, that itself is a response. I'm not sure that I would agree with that because if nothing happens, you may not have even received it. So I'm not sure. I think response means... It probably depends on the invention. If the invention is looking for an answer, it's either off or on or not alive. That's correct, Your Honor. That's correct. Whether the juice is there or not or there's no juice in the circuit. Right. Now, of course, the board didn't take that. That would be an extremely broad view. Judge Raynor was asking whether or not it's hypothetically possible that nothing is in response. That would be hypothetically possible for sure. And I think I would agree with Your Honor that it would depend a lot on what's in the specification. The other component of this is when you're looking at selecting what form of the word response, if you're talking about a liturgical response, sure, maybe somebody says something. But if you're talking about... That's a human. If you're talking about a machine, if something can respond to voice commands, well, sure, it can answer you like Alexa or whatever, or you can instruct the robot to go over there. If it responds by going over there, that is what machines do. So in the context of the patent where it's talking about circuitry, respond would actually ordinarily... It's all going to be some sort of an electrical change, either increasing volume, doing something else, and that's exactly what the prior art shows, is a response of some kind of electrical change. Now, one kind of electrical change could be sending a signal. But that's, again, that's just binary digits getting sent. It's actually an action in and of itself. So there isn't a basis to distinguish, in the context of an electrical circuit, the difference between sending a signal and sending a signal or doing something else. And that's why it's the broadest reasonable. With respect to claim differentiation, my colleague suggested we have no answer. The answer in our brief is that claim differentiation doesn't always apply. And actually, as the board found, the claims are more limited even under the broader construction. So the way the argument goes, the broader claim says, for example, audio processing circuitry. And the dependent claim says the speaker is configured to respond to certain things. And they say, well, if playing music, for example, is responding to the signal, there's no claim differentiation because there's audio processing circuitry in the speaker already. And what the board found correctly, I believe, is that the claim, the broader claim, doesn't actually require that the audio processing circuitry be connected in such a way that it's playing what's coming off the connector. The limitation actually doesn't appear in that claim. You might think it's supposed to work that way, I give you that. But the limitation's not in the claim. It is in the dependent claim. So it doesn't work on the law because it's not going to override the broadest reasonable and it doesn't work on the facts because it actually is narrower anyway. I'll yield my last minute to the court's better uses. Thank you. Thank you. I'd like to correct the record with respect to the Internet Archive in a couple of points. One is, it's undisputed on the record in this case  The Novak case that we cited talks about how third parties vacuum up, I think the term was used, information from the Internet and donate it to the Internet Archive. It's like Wikipedia. In fact, the board acknowledged this. This is in the record at 5472 during the hearing in the second IPRs when I'm talking about the standard affidavit and I say it describes how it receives data from third parties who compile and namely the third parties do that and they donate it. And I say, this is like Wikipedia. And Judge Eastholm says that corroborates what we've already understood. And the Internet Archive actually has a disclaimer for its standard affidavit. The question is, they have FAQs, this is in the record we cited at 6287. Does the Internet Archive's affidavit mean that the printout was actually the page posted on the web at the recorded time? And the answer is, the Internet Archive's affidavit only affirms that the printed document is a true and correct copy of our records. It remains your burden to convince the finder of fact what pages were up when. Now, the Internet Archive offers other services. You can pay extra, you can reimburse them for their fees and they will search their records and they will determine where the information came from, who posted it, when it was posted. And in fact, there are cases in which a representative from the Internet Archive is called to testify about this. And we cite the Bansal case, which is an example of that, where you can actually further investigate, find out where it came from, and if it's appropriate, if it would come in, you can offer it and bring it in. None of that was done here. We're talking about a standard affidavit that's blank. Is this going to authentication or to hearsay? It would go to authentication as well, but it's primarily the hearsay issue. On authentication, there's another misdirection. The authentication issue is not... What about his argument that it's created by a machine? There's no evidence that it's created by a machine. If you scour the record, every response they made in terms of the evidence, it doesn't come up until their brief in this case. The Internet Archive doesn't say it's done by a machine. If it were done by a machine... Was this a degree of discussion about how the data is created? Is that all done below? Is this... Yes, well, what I just... Is this panel hearing it for the first time? No, what I just said... Nothing about machine-generated is down below. What is down below is donated content from third parties like Wikipedia. There's a blank standard affidavit that the board itself got not filled out, not signed by anybody. What I'm trying to get at is did you lay down these arguments that you're making today, lay them down in front of the board? Well, we didn't. Sounds to me like you didn't. Oh, we laid down... I'm quoting from arguments to the board that I made regarding the third-party content donated like Wikipedia, and Judge Eastholm says that corroborates what we've already understood. That's undisputed. Machine-generated didn't come up... What do you take that to mean when the judge says that corroborates what we've already understood? They're saying, well, we understand what you're talking about and we're still going to admit this. Yeah, and what they did thereafter is on their own... It seems to me like you have a duty to make an objection once the judge says, yeah, I agree with you. That's exactly what it is. You then are supposed to lay down these arguments you're now making about why it's a mistake to treat this as though it were like Wikipedia. No, no, Wikipedia doesn't come in. Wikipedia is donated. You can contribute to Wikipedia. Wikipedia is of interest. We all look at it, but it doesn't come in as evidence. What we're talking about is something that has no source. If there was any evidence about it being machine-generated, we would be able to investigate the machine. So the fax machine cases say faxes can be set incorrectly. We have to determine if it's set incorrectly. Radar detectors, you get to determine if it's done correctly. Was the machine programmed correctly? Was it calibrated? But machine-generated doesn't come up at all until this court. It doesn't come up below at all. Okay. I think that's the key argument. Thank you. We thank both sides in the cases.